UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TRUSTEES OF THE BUFFALO LABORERS'
PENSION FUND, BUFFALO LABORERS'
WELFARE FUND, and BUFFALO LABORERS'
TRAINING FUND,

                                        Plaintiffs,

                        -vs-                                        01-CV-76C(SC)

ACCENT STRIPE, INC.,

                                        Defendant.
_____

APPEARANCES:   PROSKAUER ROSE LLP (SALLY L. SCHNEIDER, ESQ., of
               Counsel), New York, New York, for Plaintiffs.

               ROBERT G. WALSH, ESQ., Buffalo, New York, for Defendant.


## INTRODUCTION

There are three outstanding motions currently before the court: (1) Plaintiff's motion

for contempt for defendant's failure to cooperate with an audit of its payroll records

(Item 48); (2) Plaintiffs' motion for summary judgment seeking delinquent fringe benefit

contributions (Item 69); and (3) Defendant's cross motion for summary judgment seeking

an order that it is not liable for those contributions (Item 89).  Oral argument was heard on

September 11, 2006.


## FACTS

Plaintiffs commenced this action on February 5, 2001 pursuant to the Employee

Retirement Income Security Act, 29 U.S.C. § 1132 ("ERISA") (Item 1).  Plaintiffs ("Funds")

are jointly administered, multi-employer labor-management trust funds established and maintained pursuant to a collective bargaining agreement ("CBA") and the Taft-Hartley Act, 29 U.S.C. § 186, and are employee benefit plans within the meaning of ERISA.  Defendant is a contractor whose primary work consists of the repair and/or maintenance of road stripes.  In their complaint, plaintiffs sought an audit of defendant's payroll records to determine defendant's compliance with its obligation to remit employee fringe benefit contributions pursuant to a CBA with the Laborers International Union of North America, Local 210 ("Union").  On August 15, 2002, plaintiff filed a motion to compel the audit and additional discovery (Item 20).  At that time, defendant argued that it was only obligated to remit fringe benefit payments on behalf of those employees who signed and filed union authorization cards, and that plaintiffs' audit should thus be limited to those employees for whom a signed authorization card was filed.  In an order dated February 2, 2004, the court granted the motion to compel and directed that the audit be conducted for all employees without regard to the filing of authorization cards (Item 43).  In that order, the court also stated that "[i]f, during the audit process, it is discovered that deductions were not made for employees covered by the CBA, defendant can present as a defense the argument that the employees failed to sign and file the appropriate authorization for the payment of fringe benefits." *Id.*, p. 3.

The audit commenced on May 3, 2004 but was not completed because a dispute arose as to the production of certain payroll documents.  On November 5, 2004, plaintiffs filed the motion for contempt for defendant's failure to comply with the audit (Item 48).  In response to the motion, defendant argued that the CBA had been terminated in 2002 and that all relevant records had been provided to the auditor (Item 54).  The parties appeared

2

for a hearing on September 28, 2005, at which time it was agreed that the CBA had been terminated in 2002 and that the only records at issue were from 1995 and 1996.  The parties agreed to make arrangements for plaintiffs' auditor to examine the remaining records, and the audit was completed by February 2006 (Item 66).

Following the completed audit, on March 27, 2006, plaintiffs filed a motion for summary judgment seeking delinquent fringe benefit payments (Item 69).  On May 15, 2006, defendant filed its response to the motion and cross-moved for summary judgment, renewing its argument that it was not obligated to remit fringe benefit payments for those employees who had not signed authorization cards (Items 79-89).  Plaintiffs filed a reply/response on June 5, 2006 (Items 90-95).  The court heard oral argument by telephone on September 11, 2006.

In their Statement of Undisputed Facts in support of their motion for summary judgment, plaintiffs state that defendant was bound by CBAs with the Union from 1993 through 2002 (Item 69, Attachment 1, ¶ 3).  Relevant sections of the CBA from 1996 to 1999[1] provide as follows:

> ARTICLE XV - PENSION, WELFARE, S.U.B, EDUCATION AND TRAINING FUNDS
>
> 1.(a). The Employer hereby agrees to contribute the amounts hereinafter provided for in Article XXII of this Agreement to Laborers Local 210 Pension, Welfare, Supplementary Unemployment Benefits, Education and Training Funds (Hereinafter singularly and collectively referred to as "Fund') for each actual hour worked by employees covered by this Agreement. . . .
>
> . . .

---

[1] Copies of the applicable CBAs are found in the record at Items 72, 86, and 87.

ARTICLE XIX - DEDUCTIONS

1.   The Employer shall deduct from the basic wage rate of employees covered by this Agreement, the amounts hereinafter set forth in Article XXII, for each actual hour worked by such employees.

2. No deductions shall be made for any such employee unless the employee has deposited with the Employer his copy of an executed authorization form . . . .

ARTICLE XXII - WAGES

1.   A Laborer shall be paid for the entire day at the rate applicable to the highest classification in which he has worked that day.

. . .

3.   Wage Rates, Welfare, Pension, S.U.B. and Training contributions and deduction amounts are set forth below.

NOTE: The basic wage rate appearing below includes the amount to be deducted for each actual hour worked for DUES AND POLITICAL ACTION. *Dues and Political Action deductions per hour upon receipt of signed authorization cards from employee.

The CBAs from 1990 through 1993 and from 1999 through 2002 are essentially the same, with minor variations in language and numbering of paragraphs.[2]   Additionally, the 1999 CBA provides that the "Employer recognizes the Union as the exclusive collective bargaining agent for all employees covered by the Agreement."  1999 CBA, Article I, ¶ 1. Finally, all CBAs provide that if, after an audit of its books and records, the employer is found to be delinquent in the payment of fringe benefit contributions, the employer shall pay, in addition to the fringe benefit contributions, litigation and accounting costs, including

---

[2]  The 1999 CBA provides in Article XV that the "Employer shall pay monthly to the Trustees . . . the hourly rate specified in Addendum A for all hours worked by employees covered by this Agreement, for the purpose of providing benefits . . .."   Article XXII of the 1999 CBA provides job classifications, wages per hour, supplemental benefits per hour, and deductions per hour for each type of laborer.

attorney's fees and costs, interest on the unpaid amounts, and liquidated damages in the amount equal to the interest.  1990 CBA, Article XVI, ¶¶ 4, 6; 1996 CBA, Article XV, ¶¶ 4, 6; 1999 CBA Article ¶¶ 7, 9.

In opposition to the motion for summary judgment and in support of defendant's cross-motion for summary judgment, Judith Sorrentino, Payroll Supervisor of Accent Stripe submitted an affidavit in which she stated that it was her understanding that the CBAs in question "required that all fringe benefits be paid directly to the employee unless the employee submitted to the Union an authorization card permitting the benefits to be paid to the Union" (Item 81, ¶ 3).  Ms. Sorrentino stated that in 2001, she received authorization cards for seven employees and, upon notification from the Union, began to remit their deductions to the Union.  *Id.,* ¶ 4.   Ms. Sorrentino prepared a list of jobs from 1995 to March 31, 2002 that "would have been within the jurisdictional limits of the [CBA] . . . ."  *Id.,* ¶ 5.  She stated that she maintained a certified payroll for these jobs and confirmed that all fringe benefits were paid either directly to the employee "or to the Union for those employees who had signed authorization cards."  *Id.*  Ms. Sorrentino stated that an audit was conducted in 1997 by the Union and the auditor "found no delinquencies in [defendant's] payment of the benefits to its employees . . . ."  *Id.,* ¶ 6.  An earlier audit in 1991 likewise found no delinquencies to Ms. Sorrentino's knowledge.  *Id.,* ¶ 10.

Ms. Sorrentino stated that all relevant records were provided to plaintiff's auditor Joseph McCarthy pursuant to this court's order (Item 81, ¶13).  Ms. Sorrentino also stated that the audit is faulty for the following reasons:  (1) she cannot comment on the auditor's conclusion without a "detailed scheduled" that was supposed to have been made a part

of the audit;[3] (2) the auditor did not state that he received signed authorization cards for the employees; and (3) only a small portion of the work involved in painting stripes on road surfaces is "arguably" covered by the CBA.  *Id., ¶¶* 14-16.

Edward Spiesz, defendant's Vice President, submitted an affidavit in which he stated that his company is a non-union contractor which performs no heavy highway work. He stated that defendant paints road stripes, usually on existing roadways, and rarely on newly constructed roads (Item 82, ¶ 2).  Mr. Spiesz stated that in 2000, the parties negotiated a Memorandum of Understanding or "MOU," in which they agreed that employees of Accent Stripe who are union members shall not be covered by the CBA when they perform work on Accent Stripe's premises unrelated to the work set forth in the CBA.  He stated that the 2002 MOU indicates an understanding between the union and the defendant that defendant's work is not done by "laborers."  *Id., ¶* 5.  Mr. Spiesz stated that none of the work performed by defendant is covered by the CBA's jurisdiction.  *Id., ¶* 7.

Mr. Spiesz stated that defendant and the union had an "understanding" whereby a "token" number of employees became union members, and a "representative" amount of fringe benefits contributions were remitted "because it was too difficult to parse out which aspects of the various jobs . . . involved covered work, if any."  *Id., ¶¶* 9-10.  Later, after the union was placed under federal receivership, the new union leadership "refused to consider the past practice between the Union and [defendant]."  *Id.,* p. 6, ¶ 3.

---

[3]  In her affidavit, Item 93, Sally Schneider, attorney for plaintiffs, states that she sent audit summary sheets and detailed schedules to defense counsel in November 2005 and received no response.  The documents are attached to the affidavit and are clearly available to defense counsel and his client.

Mr. Spiesz stated that, "in light of the New Regime's insistence on the strict letter of the CBA," defendant then insisted that the Union procure signed authorization cards from its members before fringe benefits were sent to the union (Item 82, p. 6, ¶ 5).  On or about June 22, 2001, after the cards were received, defendant began to deduct fringe benefits from the employees' paychecks which were sent to the union.  *Id.*  Mr. Spiesz stated that it has never been his understanding that "fringe benefits could be deducted from an employee's paycheck without a signed authorization card.  Also, unless an employee became a Union member, the Union had no basis to require fringe benefit contributions for that employee."  *Id.,* p. 7, ¶ 6.  It is defendant's position that it had "no authority to deduct fringe benefits from an employee's paycheck and send them to the Union with out (sic) the requisite cards."  *Id.,* p.11, ¶ 14.  "Where authorization cards were furnished, fringe benefits were deducted from the employee's paycheck and sent to the Union.  Where no authorization cards were furnished, the gross basic wage rate was paid to the employee."  *Id.*[4]

In further support of plaintiffs' motion for summary judgment and in opposition to defendant's cross motion, Thomas L. Panek, administrator of the funds, stated that defendant was bound by CBAs with the Union from 1993 through March 31, 2002 (Item 92, ¶ 3).  The Funds are third-Party beneficiaries of the agreements, and they did not negotiate the CBAs.  *Id.,* ¶ 4.  The Funds provide benefits to eligible employees of

---

[4] Defendant's affidavits regarding the payment of fringe benefits are somewhat contradictory and unclear.  Mr. Spiesz states that fringe benefits were deducted from the paycheck of the union employees, while non-union members were paid the "basic wage rate."  Ms. Sorrentino states that fringe benefits were paid to the union for union members, and directly to the non-union employees.  It is difficult to imagine that defendant would have paid its union employees the hourly wage and deducted $10.60 per hour for fringe benefits as Mr. Spiesz states, and paid the non-union workers the hourly wage rate plus $10.60 in fringe benefits as Ms. Sorrentino states.

employers who have entered into and are bound by CBAs with the union.  They provide benefits to eligible employees regardless of union membership.  *Id., ¶* 6.  To Mr. Panek's knowledge and based upon the Funds' records, no audit of defendant was conducted on behalf of the Funds in 1997.  *Id., ¶* 7.  Fringe benefit contributions are not deductions and do not require any authorization from the employees because the CBA requires the employer to pay the benefit contributions directly to the funds, not to the employees.  *Id., ¶* 8.

Joseph McCarthy, the Funds' auditor, stated that he examined the certified payroll records for the list of jobs that Ms. Sorrentino stated were covered by the CBA (Item 91, ¶¶ 4-5).  He identified "laborers" and "foremen" who worked on those jobs, and the number of hours they worked.  He then compared the number of hours paid to the Funds with the number of hours worked to arrive at the number of hours due and owing.  He then multiplied this number of hours by the applicable fringe benefit rate.  *Id.*  McCarthy stated that he did not examine authorization cards because the obligation to pay fringe benefit contributions is not limited to members of the Union, and he had not been requested to determine the amount of any dues or political action deductions owed to the Union.  *Id., ¶* 6.  The audit of defendant's books and records indicated that defendant was delinquent in its fringe benefit contribution payments in the amount of $387,964.23 for the period March 1, 1995 through March 31, 2002.  *Id., ¶* 7.

**DISCUSSION**

**1.  Plaintiffs' Motion for Contempt**

Turning first to plaintiffs' motion for contempt, plaintiffs seek attorney fees in the amount of $23,260.00 for work expended attempting to conduct the audit of defendant's records. It is apparent that the full audit would not have been completed had not plaintiffs filed the motion for contempt.  However, in both its motion to compel and for an order of civil contempt, plaintiffs sought records from 1995 "to the present" and did not inform the court that defendant had terminated the CBA in 2002.[5]  Defendant had partially complied with this court's order, and had provided most records for the time periods covered by the CBAs.  At the hearing on plaintiff's motion for contempt conducted on September 15, 2005, the parties agreed that the CBA was terminated in 2002.  Plaintiffs sought only certain records from 1995 to 1996 as some records from that time period had been produced during the earlier audit.  The parties were directed to meet to resolve the issue of the missing records.  Since that time, the records have been produced and the audit has been completed.

Although the federal courts' inherent power to punish for contempt is a "firmly established principle," *People by Abrams v. Terry*, 45 F.3d 17, 23 (2d Cir. 1995) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)), this power is "significantly circumscribed." *United States v. Local 1804-1, Int'l Longshoremen's Ass'n*, 44 F.3d 1091, 1096 (2d Cir. 1995).   "The failure to meet the strict requirements of an order does not necessarily subject a party to a holding of contempt . . . ." *Dunn v. N.Y. State Dep't of*

---

[5]  The fact that the CBA was terminated in 2002 was not brought to the court's attention until defendant raised it in its response to the motion for contempt.

*Labor*, 47 F.3d 485, 490 (2d Cir. 1995).   Rather, a court can impose civil contempt sanctions only if (1) the order violated by the contemnor is "clear and unambiguous," (2) the proof of non-compliance is "clear and convincing," and (3) "the contemnor was not reasonably diligent in attempting to comply." *Local 1804-1*, 44 F.3d at 1096.

Here, the order of the court was clear and unambiguous.  Defendant was ordered to produce records from 1995 "to the present" without regard to the existence of signed authorization cards.  It is clear that defendant failed to comply with this order, but the failure to comply was based on the meritorious defense that defendant had terminated the CBA in 2002.  Plaintiffs either did not know that the CBA had been terminated or failed to inform the court in a timely manner.  Taking an aggressive approach to the litigation, they sought information and records which were irrelevant and inadmissible.  Similarly, defendant took an obstructionist position.  Rather than seek reconsideration of the court's discovery order, defendants waited until plaintiffs filed the motion for contempt to inform the court that the CBA had been terminated.  At the time of the hearing on the motion for contempt, it became apparent that plaintiffs were over-reaching, and the scope of defendant's alleged contempt was less than the court originally had understood.

The court recognizes that much time and effort were expended by plaintiffs' counsel on securing defendant's compliance with the audit, and it appears that the audit may not have been concluded without the filing of the motion for contempt.  However, a finding of contempt is an equitable remedy under Second Circuit law, and "subject to equitable defenses . . .." *Brennan v. Nassau County*, 352 F.3d 60, 63 (2d Cir.2003).  The "unclean hands" doctrine "closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been

10

the behavior of the defendant." *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 814 (1945).  Here, neither party is entirely blameless for the delay in conclusion of the audit, as plaintiffs sought production of records to which they were not entitled and defendant failed to comply with the order of the court, knowing that it was not correct but failing to apprise the court or seek reconsideration.  Accordingly, the court concludes that plaintiffs are not entitled to a finding of civil contempt, and the motion is denied.

### 2.  Plaintiffs' Motion for Summary Judgment

Plaintiffs argue in support of their motion for summary judgment that defendant is liable for the payment of $387,964.23 in unpaid fringe benefit contributions.  They have submitted the audit report and the CBAs, which purport to establish that certain employees worked on jobs that were covered by the CBA and that contributions had not been made on their behalf.   Defendant argues that it paid to the "Union"[6] all fringe benefits required to be paid under the "Wages" article of the CBA for those employees who submitted signed authorization cards, and paid all fringe benefits directly to the employees under the "Wages" article of the CBA for those employees who were not members of the Union (Item 86, Affidavit of Attorney Robert G. Walsh, ¶¶ 11-12).  Thus, defendant argues that it is not responsible for the payment of fringe benefits for employees who did not submit a signed authorization card.

---

[6] Defendant uses the term "union" to refer to plaintiffs, even though the plaintiffs are the trustees of the employee benefit plan.

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986).  A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant.  *See Liberty Lobby*, 477 U.S. at 248.  In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255.  To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  When opposing a motion for summary judgment, it is not sufficient for the non-moving party to present evidence that is conclusory or speculative, with no basis in fact.  *See Liberty Lobby*, 477 U.S. at 249-50.

Courts have "consistently construed collective bargaining agreements as unequivocally obligating an employer to contribute to an employee benefit  plan for all its employees, irrespective of union membership."  *Plumbers, Pipefitters and Apprentices Local Union No. 112 Pension, Health and Educ. and Apprenticeship Plans. v. Mauro's Plumbing, Heating and Fire Suppression, Inc.,* 84 F. Supp. 2d 344, 353 (N.D.N.Y. 2000). In *Teamster's Local 348 Health and Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315, 319 (6th Cir. 1984), *cert. denied*, 471 U.S. 1017 (1985), the Sixth Circuit rejected defendant's argument that the collective bargaining agreement required contributions only on behalf of those employees who were members of the union. The court held that defendant was obligated to make contributions for both union and non-union employees

12

and set forth four factors that would aid in determining the scope of a collective bargaining agreement. *See id.* at 318. First, the court explained that where the collective bargaining agreement defines employees by job classification, all employees, union and non-union, are covered by the terms of the agreement. *See id.* at 318. Second, it stated that "a recognition clause designating the union as the exclusive bargaining agent for all employees indicates that fringe benefit contributions are required for both union and non-union members." *Id.* at 318. Third, the court noted that the lack of any specific language in the collective bargaining agreement distinguishing between union and non-union employees suggests that no distinction was intended and therefore, all employees are covered by the agreement. *See id.* at 318. Finally, the court found that the presence of a union shop clause, which requires employees to be members of the union, merely requires "payment of union dues and not union membership." *Id.* at 318. Equating covered employees with union members would render the shop clause meaningless. *Id.*

Several courts within this circuit have adopted the approach of the Sixth Circuit. *See Trustees of Local 807 Labor-Management Health & Pension Funds v. River Trucking and Rigging, Inc.*, 2005 WL 2290579, *3 (E.D.N.Y. September 20, 2005); *Demolition Workers Union v. Mackroyce Contracting Corp.*, 2000 WL 297244, at *4 (S.D.N.Y. March 22, 2000); *Plumbers, Pipefitters and Apprentices Local Union No. 112 Pension, Health and Educ. and Apprenticeship Plans v. Mauro's Plumbing, Heating and Fire Suppression, Inc.*, 84 F. Supp. 2d 344, 353 (N.D.N.Y. 2000); *Cent. Pension Fund of the Int'l Union of Operating Engineers & Participating Employers v. Murphy's Tire, Inc.*, 1998 WL 865594, at *5 (N.D.N.Y. Dec. 9, 1998); *NYSA-ILA Med. and Clinical Servs. Fund v. Golten Marine*

13

*Co., Inc.*, 1994 WL 800706, at *4 (S.D.N.Y.  Dec. 21, 1994);  *New York State Teamsters Council Health and Hosp. Fund v. City of Utica*, 643 F. Supp. 619, 621-22 (N.D.N.Y. 1986).

Here, the CBAs define employees by job classification, not by union membership. Article IV of all three CBAs provides that, "this Agreement is to cover all watchmen, flagmen, (all crafts), fire watchmen, traffic control men, laborers, foremen . . . ."  Second, the 1999 CBA includes a clause designating the Union as the "exclusive collective bargaining agent for all employees covered by the Agreement." 1999 CBA, Article 1, § 1. Third, none of the CBAs makes a distinction between union and non-union employees for the purposes of contribution payments.  Rather, Article XV of the 1999 CBA provides that the employer "shall pay monthly to the Trustees of the Laborers' Local 210 Welfare Fund the hourly rate specified in Addendum A for all hours worked by employees covered by this Agreement" for medical, pension, education and training benefits.  1999 CBA, Article XV, ¶¶ 1-3.  Likewise, Article XXVI of the 1990 CBA and Article XV of the 1996 CBA provide that "the Employer agrees to contribute . . . to the Laborers Local 210 Pension, Welfare, Supplementary Unemployment Benefit, Education and Training Funds . . . for each actual hour worked by employees covered by this Agreement."  Finally, the union shop clause in the 1999 CBA requires that "[i]t shall be a condition of employment that all employees of the Employer who perform work covered by this Agreement shall become or remain members in good standing of the Union or shall pay uniform initiation and agency fees . . .."  1999 CBA, Article VI, ¶ 1.  As courts have held in previous cases, "equating covered employees with union members would render the clause meaningless."  *Demolition Workers*, 2000 WL 297244, at *5; *see also Kohn Beverage*, 749 F.2d at 318; *Mauro's Plumbing*, 84 F. Supp. 2d at 354.

14

In contrast, Article XX of the 1990 CBA and Article XIX of the 1996 and 1999 CBAs provide that the "Employer shall deduct from the basic wage rate of employees covered by this Agreement, the amount hereinafter set forth . . .",  but "[n]o deductions shall be made for any such employee unless the employee has deposited with the Employer his copy of an executed authorization . . ."  Article XXII of the 1999 CBA provides specific amounts to be paid as wages for each job classification, supplemental benefits per hour, and deductions per hour.  Dues deductions are "6% of gross wages for each hour worked" and political action deductions are "$0.10 deducted from wages for each hour worked." 1999 CBA, Article XXII, ¶¶ 2(d), 3(d).  Article XXII also provides that "[t]he basic wage rate includes the amount to be deducted for each actual hour worked for DUES AND POLITICAL ACTION.  Dues and Political Action Deductions per hour upon receipt of signed authorization cards from employees."  *See also* 1996 CBA, Article XXII, 1990 CBA, Article XIII.

The court has examined the entire CBA in the context of applicable Second Circuit law and concludes, as a matter of law, that defendant is obligated by the terms of the CBA to remit employee fringe benefit contributions for all employees covered by the CBA. Those employees who work on jobs within the jurisdiction of the CBA are "covered employees" regardless of union membership.  The CBA explicitly states that "deductions" for union dues and political action are limited to those employees who have executed an authorization form, while fringe benefit "contributions" to the Funds must be made for all covered employees.

In opposition to the motion for summary judgment, defendant argues that the majority of its work is not covered by the CBA because road painting does not constitute

15

road construction.  The CBAs provide that they cover "all Highway and Heavy Construction

. . . including, but not limited to, the construction of highways, roads, streets, bridges . . ..

This Agreement shall also cover all work traditionally performed by laborers."  Article II, ¶

1.   In support of the motion, plaintiffs have submitted an affidavit of Harley Locking,

business agent of Laborer's Local 210 who states that the CBAs cover

> all work in connection with highways, roads, streets, bridges, runways,
> sidewalks, etc., from new construction to resurfacing and other maintenance
> work, and includes all work related to such projects from the beginning of a
> project, such as setting up and marking the site where work is to be
> performed, to the end of the project, such as painting stripes on the roadway
> and landscaping

(Item 90, ¶ 5).  Mr. Locking states that the 2002 MOU was negotiated to address some of

the union's grievances with defendant, and the only modification to the CBA in the 2002

MOU involved employees of defendant who are union members performing work on

Accent Stripe's premises unrelated to work set forth in Articles II and IV of the CBA.  *Id.,*

¶ 8.  It is Mr. Locking's position that the CBA covers all employees who performed covered

work within the union's geographic jurisdiction, without distinction between union members

and non-members without authorization cards.  *Id.,* ¶ 12.  Additionally, in her affidavit, Ms.

Sorrentino admits that she maintained a certified payroll for all union jobs "that would have

been within the jurisdictional limits of the" CBA (Item 81, ¶ 5).  Defendant has failed to raise

a genuine issue of material fact that its road painting work is outside the jurisdiction of the

CBA.  Having examined the CBA and the affidavits in support of and in opposition to the

motion for summary judgment, the court concludes as a matter of law that defendant's road

painting is covered work under the CBA.

Defendant also argues that "the union" conducted audits in 1991 and 1997 and failed to find any deficiencies in fringe benefit contributions or any problems in the way in which defendant was paying its employees.  Thomas Panek, the Administrator of the Funds, stated in an affidavit that no audit of Accent stripe was conducted in 1997 on behalf of the Funds.  Item 92, ¶ 7.[7]

Congress enacted section 515 of ERISA in order to permit plan trustees to collect delinquent contributions effectively and without regard to defenses that might be asserted regarding the formation of the collective bargaining agreement.  *See Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 313-14 (2d Cir.), *cert. denied*, 498 U.S. 982 (1990). The courts have regarded pension and welfare funds in section 515 actions to be in a superior position to unions concerning their right to collect benefit fund contributions.  *See Benson*, 907 F.2d at 314. Pension or welfare funds are "entitled to enforce the writing without regard to understandings or defenses applicable to the original parties." *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1149 (7th Cir.1989).

It is well settled that traditional contract defenses are generally not available in suits brought to collect delinquent contributions under ERISA.  *See, e.g., Southwest Administrators, Inc. v. Rozay's Transfer*, 791 F.2d 769, 773 (9th Cir. 1986), *cert. denied*, 479 U.S. 1065 (1987).  However, the Second Circuit has recognized two defenses which are permitted in section 515 actions: "(1) that the pension contributions themselves are illegal, and (2) that the collective bargaining agreement is void (not merely voidable)."

---

[7] In his affidavit, Mr. Panek did not address the alleged audit in 1991.

17

*Benson*, 907 F.2d at 314 (quotations omitted).   In this case, defendant raises neither of these defenses.   Its estoppel argument, that a previous "union" audit found no delinquencies, is not permitted in a section 515 ERISA action.   *See Bricklayers and Allied Craftworkers Local 2 v. C.G. Yantch, Inc.,* 316 F. Supp. 2d 130, 146 (N.D.N.Y. 2003) (in the absence of questions of fact going to the validity of the agreement itself, defenses such as lack of meeting of the minds, duress, breach, and fraud in the inducement are not permissible in section 515 actions).

Finally, defendant argues that it cannot challenge the findings of the audit with the documents it was provided.   Plaintiffs state that defendant has been provided all the documents necessary, including detailed schedules and summary sheets, to challenge the findings of the audit.   Defendant can point to no specific deficiency with the audit, but merely argues that fringe benefit contributions were not required to be paid to the Funds on behalf of employees who did not execute a union authorization card.   Defendant asks however that, should the court find that it is obligated to remit fringe benefit contributions on behalf of all covered employees regardless of union membership, it be provided an opportunity "to determine on what basis the Union's conclusions were reached" (Item 82, ¶ 15).

The court finds that defendant is liable for the payment of delinquent fringe benefits, but will provide defendant an opportunity to review the audit.   In addition to the amount of delinquent fringe benefits, plaintiffs are entitled to additional damages pursuant to the CBAs and ERISA, 29 U.S.C. § 1132(g)(2).   Where a plaintiff prevails in a ERISA section 515 collection action,

the court shall award the plan (A) the unpaid contributions, (B) interest on the unpaid contributions, (C) an amount equal to the greater of (i) the interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan in the amount not in excess of 20 percent . . . of the amount [found to represent the unpaid contributions], (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and (E) such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2)(A) - (E).  Additionally, The 1990 CBA provides that if the employer is found to be delinquent in the payment of fringe benefit contributions, it "will be charged with all litigation and accounting expenses incurred . . . ."  1990 CBA, Article XVI, § 4(a); *see also* 1996 CBA, Article XV, § 4(a).  The 1990 and 1996 CBAs also provide that the delinquent employer shall bear the costs of the audit.  1990 CBA, Article XVI, § 6, 1996 CBA, Article XV, § 6.  Article XV of the 1999 CBA provides that the delinquent employer shall pay interest on the unpaid amounts from the date due until the date of payment at the rate prescribed in 26 U.S.C. § 6621.  1999 CBA, Article XV, § 7(a)   The 1999 CBA also provides that if the Funds must bring an action to recover the delinquent payments, the employer is obligated to pay the reasonable costs and attorney fees incurred in bringing such action.  *Id.*  Finally, the Funds are entitled to an amount equal to the interest on the unpaid contributions as and for liquidated damages.  1999 CBA, Article XV, § 7(b); *see also* 29 U.S.C. § 1132(g)(2);

Accordingly, the plaintiffs' motion for summary judgment is granted on the issue of liability.  Plaintiffs shall file an affidavit with supporting documents, setting forth all damages including delinquent fringe benefits, liquidated damages, interest, fees and costs. Defendant shall have the opportunity to review the audit and statement of damages and to file a response.  Thereafter, the court will enter judgment in favor of the plaintiffs.

**3.  Defendant's Cross Motion for Summary Judgment**

Defendant has conceded that it remitted fringe benefit contributions to the Fund only for those employees for whom a signed authorization card was on file.  Defendant's cross-motion is based on its argument that it is not obligated to remit fringe benefits to the Fund for employees who have not submitted signed authorization cards.  In support of this argument, defendant points to a sentence in this court's order of January 9, 2004.  In response to plaintiffs' motion to compel, defendant had argued that it need not provide payroll records of employees who were not union members.  The court rejected that argument and ordered that the records be produced for all employees regardless of whether signed union authorization cards were on file.  The order states that "[i]f, during the audit process, it is discovered that deductions were not made for employees covered by the CBA, defendant can present as a defense the argument that the employees failed to sign and file the appropriate authorization for the payment of fringe benefits."  Defendant now relies upon this statement as a determination that signed authorization cards are required for the payment of fringe benefits to the union funds.  *See* Item 82, p.11, ¶13.  The statement in the January 9, 2004 order is not a determination of the issue and may not be relied on as such.  As stated above, the payment of fringe benefit is required for all employees, not just union members.  Accordingly, defendant has failed to raise a genuine issue of material fact regarding its obligation to remit fringe benefit payments, and the cross-motion is denied.

**CONCLUSION**

Plaintiffs' motion for contempt is denied, plaintiffs' motion for summary judgment on liability is granted, and defendant's cross-motion for summary judgment is denied. Plaintiffs shall file their statement of damages on or before June 15, 2007, and defendant shall review the audit and statement of damages and file a response on or before June 29, 2007. Upon receipt of all submissions, the court will enter judgment in favor of plaintiffs.

So ordered.

_____\s\ John T. Curtin____
JOHN T. CURTIN
United States District Judge

Dated:   May   22   , 2007
p:\opinions\01-76.may1107

21